Nos. 17-1118, -1202

IN THE

# United States Court of Appeals for the Federal Circuit

ORACLE AMERICA, INC.,

*Plaintiff-Appellant*,

*v.*

GOOGLE INC.,

*Defendant-Cross-Appellant*.

On Appeal from the United States District Court
for the Northern District of California
No. 3:10-cv-03561-WHA Hon. William H. Alsup

## CORRECTED RESPONSE & REPLY BRIEF
## FOR ORACLE AMERICA, INC.

Dorian E. Daley
Deborah K. Miller
Matthew M. Sarboraria
Ruchika Agrawal
ORACLE AMERICA, INC.
500 Oracle Parkway
Redwood Shores, CA  94065

Mark S. Davies
Kelsi Brown Corkran
Melanie L. Bostwick
Jeremy Peterman
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
1152 15th Street NW
Washington, DC  20005

E. Joshua Rosenkranz
Peter Bicks
Annette L. Hurst
Lisa T. Simpson
Andrew D. Silverman
Matthew L. Bush
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
51 West 52nd Street
New York, NY  10019
(212) 506-5000

Dale M. Cendali
Joshua L. Simmons
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY  10022

*Counsel for Plaintiff-Appellant*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................. iii

SUMMARY OF ARGUMENT .................................................................... 1

ARGUMENT ............................................................................................. 5

I.    Oracle Is Entitled To Judgment As A Matter Of Law ................... 5

    A.    The winner of each factor and the overall balancing are legal matters reviewed de novo. ............................................. 5

    B.    Factor 1: Google's purpose in copying was purely commercial and not transformative. ................................... 10

        1.    Google's copying was entirely commercial. ................. 10

        2.    Google's copying was not transformative. .................. 12

            a.    Smartphones were not a new context for the Java APIs. ........................................................... 12

            b.    Moving the APIs to smartphones, even if a new context, was not transformative. ................ 13

        3.    Google's purported evidence of good faith does not count in favor of fair use. ........................................... 23

    C.    Factor 2: Oracle's APIs are indisputably creative. .............. 26

    D.    Factor 3: Google indisputably copied important Java features. ............................................................................... 29

        1.    Google's copying was substantial by any measure. ..... 30

        2.    Google's justifications for the copying are irrelevant to fair use as a matter of law. .................. 32

    E.    Factor 4: Google's copying harmed both the actual and potential markets for the Java platform and its derivatives. ......................................................................... 35

        1.    Google does not dispute evidence of market substitution in markets Java SE already occupied. ...................................................................... 37

i

       2.     Evidence of harm to potential markets for Java SE remains undisputed. ..................................... 40

       3.     Google cannot disprove the market harm from widespread copying akin to Google's........................... 44

   F.   Consistent with the purposes of copyright, the balance of the factors weighs against fair use as a matter of law........................................................................................ 46

II.    At A Minimum, Oracle Is Entitled To A New Trial...................... 49

   A.   The district court erred in banning evidence that Android is a software platform that competes with Java across devices. ........................................................... 50

       1.     The evidence of different markets for the infringing Android software platform was highly relevant...................................................................... 51

       2.     The district court's case-management concerns cannot justify excluding highly relevant evidence. .... 56

       3.     Google fails to refute Oracle's showing that it was severely prejudiced. ...................................... 58

   B.   The district court erred in not holding Google accountable for its knowing and repeated false representations in discovery and to the jury. ...................... 59

       1.     Google did not cure the false statements in its written discovery by hiding a few documents in a document dump........................................................... 60

       2.     Google does not defend its misrepresentation to the jury. ................................................................. 64

   C.   The district court's evidentiary errors on Google's bad faith require correction. ....................................................... 66

III.   Google Does Not Urge This Court To Revisit Its Earlier Holding Finding Oracle's Work Copyright Protected................... 71

CONCLUSION ....................................................................... 71

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*A&M Records, Inc. v. Napster, Inc.*,
  239 F.3d 1004 (9th Cir. 2001) ........................................... 11, 23, 43, 44

*Advanced Display Sys., Inc. v. Kent State Univ.*,
  212 F.3d 1272 (Fed. Cir. 2000) ........................................... 62

*Authors Guild v. Google, Inc.*,
  804 F.3d 202 (2d Cir. 2015) ............................................... 19

*Blanch v. Koons*,
  467 F.3d 244 (2d Cir. 2006) ............................................... 20

*Campbell v. Acuff-Rose Music, Inc.*,
  510 U.S. 569 (1994) .................................... 16, 18, 19, 32, 43, 44, 46, 50

*Castle Rock Entm't, Inc. v. Carol Pub. Group Inc.*,
  150 F.3d 132 (2d Cir. 1998) ............................................... 33

*Country Shindig Opry, Inc. v. Cessna Aircraft Co.*,
  780 F.2d 1408 (8th Cir. 1986) ............................................. 24

*DC Comics v. Towle*,
  802 F.3d 1012 (9th Cir. 2015) ............................................. 40

*Dr. Seuss Enters., L.P. v. Penguin Books USA, Inc.*,
  109 F.3d 1394 (9th Cir. 1997) ................................................ 17, 18, 26

*Elvis Presley Enters., Inc. v. Passport Video*,
  349 F.3d 622 (9th Cir. 2003) ............................................... 30

*Fischer v. Dees*,
  794 F.2d 432 (9th Cir. 1986) ............................................... 5

*Gamma Audio & Video, Inc. v. Ean-Chea*,
  11 F.3d 1106 (1st Cir. 1993) ............................................... 40

iii

*Gaylord v. United States*,
  595 F.3d 1364 (Fed. Cir. 2010) ......................................... 15

*Harper & Row Publ'rs., Inc. v. Nation Enters.*,
  471 U.S. 539 (1985) ................................................... *passim*

*Henry v. Dep't of Justice*,
  157 F.3d 863 (Fed. Cir. 1998) ............................................ 71

*Integra Lifesciences I, Ltd. v. Merck KGaA*,
  496 F.3d 1334 (Fed. Cir. 2007) ............................................ 7

*Kelly v. Arriba Soft Corp.*,
  336 F.3d 811 (9th Cir. 2002) ......................................... 8, 15

*L.A. News Serv. v. CBS Broad., Inc.*,
  305 F.3d 924 (9th Cir. 2002) ............................................ 20

*L.A. News Serv. v. Reuters Television Int'l, Ltd.*,
  149 F.3d 987 (9th Cir. 1998) ................................... 8, 37, 39

*Mattel, Inc. v. Walking Mountain Prods.*,
  353 F.3d 792 (9th Cir. 2003) ............................................ 14

*Micro Star v. Formgen Inc.*,
  154 F.3d 1107 (9th Cir. 1998) ..................................... 33, 44

*Obrey v. Johnson*,
  400 F.3d 691 (9th Cir. 2005) ............................................ 56

*Oracle America, Inc. v. Google Inc.*
  750 F.3d 1339 (Fed. Cir. 2014) ................................... *passim*

*Peter Letterese & Assocs., Inc. v. World Inst. of Scientology Enters., Int'l*,
  533 F.3d 1287 (11th Cir. 2008) .......................................... 25

*Pincay v. Andrews*,
  238 F.3d 1106 (9th Cir. 2001) ........................................... 10

*R.R. Dynamics, Inc. v. A. Stucki Co.*,
  727 F.2d 1506 (Fed. Cir. 1984) ........................................... 7

iv

*Reeves v. Sanderson Plumbing Prods., Inc.,*
530 U.S. 133 (2000) ...................................................................... 7, 13

*Sega Enters Ltd. v. Accolade, Inc.,*
977 F.2d 1510 (9th Cir. 1992) ............................................................ 27

*Seltzer v. Green Day, Inc.,*
725 F.3d 1170 (9th Cir. 2013) ........................................... 6, 7, 8, 14, 20

*SmithKline Beecham Corp. v. Apotex Corp.,*
439 F.3d 1312 (Fed. Cir. 2006) .......................................................... 71

*Sony Comput. Entm't, Inc. v. Connectix Corp.,*
203 F.3d 596 (9th Cir. 2000) ............................................. 20, 21, 27, 36

*Sony Corp. of Am. v. Universal City Studios, Inc.,*
464 U.S. 417 (1984) ...................................................................... 8, 47

*St. Louis v. Praprotnik,*
485 U.S. 112 (1988) .......................................................................... 10

*Stewart v. Abend,*
495 U.S. 207 (1990) ............................................................... 22, 44, 51

*TCA Television Corp. v. McCollum,*
839 F.3d 168 (2d Cir. 2016 ........................................................ 15, 17

*Tennison v. Circus Circus Enters., Inc.,*
244 F.3d 684 (9th Cir. 2001) ............................................................. 59

*Video Pipeline, Inc. v. Buena Vista Home Entm't,*
342 F.3d 191 (3d Cir. 2003) .............................................................. 19

*Wall Data Inc. v. L.A. Cty. Sheriff's Dep't,*
447 F.3d 769 (9th Cir. 2006) ................................................... 8, 29, 46

*Wharf v. Burlington N. R.R. Co.,*
60 F.3d 631 (9th Cir. 1995) ......................................................... 64, 65

*Wordtech Sys., Inc. v. Integrated Networks Sols., Inc.,*
609 F.3d 1308 (Fed. Cir. 2010) .......................................................... 24

*Worldwide Church of God v. Phila. Church of God, Inc.*,
   227 F.3d 1110 (9th Cir. 2000)........................................................41, 44

## Statutes & Rules

17 U.S.C. § 101............................................................................. 18

17 U.S.C. § 107................................................................. 16, 32, 50, 51

Fed. R. of Evid. 403......................................................................51

Fed. R. of Evid. 801(d)(1)(B).........................................................69

## Other Authorities

1 Melville B. Nimmer & David Nimmer, *Nimmer on
   Copyright* (Matthew Bender, Rev. Ed.).........................................26, 40

Ned Snow, *Fair Use As a Matter of Law*, 89 Denv.
   U. L. Rev. 1 (2011) ....................................................................9

11 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal
   Practice and Procedure* (3d ed. 2008)................................................58

# SUMMARY OF ARGUMENT[1]

The fair use ruling here was an aberration.  Google attempts to defend it with a topsy-turvy vision of fair use that contorts established doctrine beyond recognition.  Google insists that its use was not entirely commercial, even though it yielded billions of dollars.  Google asserts it transformed the expressive message of the declaring code, even though the code it copied means and does the same thing in Java and Android, and even though Google touts the fact that it copied the code precisely because that message was familiar to the fan base of app developers Google wanted to attract.  Google claims to have copied only a tiny bit, when it unnecessarily copied 11,330 lines of code, including 100% of the structure and organization of the 37 packages best suited for a mobile device.  Google declares that it inflicted no harm on actual markets, without refuting the most concrete instances of such harm and without saying a word about the equally important harm to potential markets.

In place of faithful application of established law, Google resorts largely to slogans.  It emphasizes that appellate courts rarely overturn

---

[1] We cite Oracle's Opening Brief as "OB"; Google's Brief as "GB"; and amicus briefs as "__ Br.," according to the lead amicus.

jury verdicts finding fair use, without acknowledging that courts rarely let this mixed question of law and fact get to a jury.  Google repeatedly asserts that its use was fair because Java was "free and open for everyone to use."  GB31, 45, 63.  But that is just a play on words: "open" means Oracle offered an open-source license and "free" means that app developers could use the APIs without paying, but only upon agreeing to a license.  Neither Sun nor Oracle ever allowed a commercial enterprise to release a competing commercial platform for free, much less without a license.

Similarly unedifying are Google's claims that Android was "the world's first open-source, full-stack mobile operating system" and that Google worked hard to supplement Java.  GB2, 4, 10, 75.  Google has benefited handsomely from Android.  Had Google written its platform without leveraging key components from Java to attract Java developers, device manufacturers, and mobile carriers, Google would be entitled to reap all the benefits of Android.  But having chosen to incorporate Oracle's copyrighted work into Android, Google must compensate Oracle for the considerable boost Java provided.

Bottom line:  Google cites no case ever upholding a use as fair where an infringer copied so much and put the copied work to the same use in a competing commercial product.  The undisputed facts established at trial entitle Oracle to fair use as a matter of law.

That should be the end of this appeal.

But in no event can this judgment stand.  Google's own JMOL arguments only underscore the trial's unfairness.  At every turn, Google emphasizes the trial theme that Android and Java are distinct because Android and Java operate in separate spheres—smartphones versus personal computers—and do not compete.  Without that theme, Google would have practically nothing to say on the crucial first and fourth factors.

The district court, however, prevented the jury from learning that the theme was false—Java and Android are both platforms designed for multiple devices and compete head-to-head in numerous overlapping markets.  Google's effort to justify that evidentiary ruling revolves around the legal fallacy that the infringement and fair-use analyses vary from one device to the next.  That is wrong.  Google's infringing use was copying Java code into the Android platform it designed to

operate with multiple types of devices.  Once it did that, the separate decisions of multiple manufacturers to load Google's infringing software onto their devices does not change either *Google's* infringement or its fair-use defense.

Perhaps most startling is what Google says about its discovery misconduct and trial misrepresentations.  Nothing.  Google does not dispute that its discovery responses were false when made or that Google knew they were false.  It offers no excuse or defense.  It merely notes that Oracle could have figured out the truth in a handful of documents produced in an eleventh-hour document dump too late to be used in depositions.  Nor does Google dispute that it was not telling the truth when it repeatedly told the jury that Android is not for computers.  It responds only that it also made some truthful statements.  If a trial is to have any integrity, courts cannot reward parties for such misrepresentations.

Google's use was not fair—and neither was the trial.

# ARGUMENT

## I. Oracle Is Entitled To Judgment As A Matter Of Law.

Google does not dispute a central premise of our opening brief (OB2, 16-19, 30-31, 46-52): The record this time around is markedly different from the last appeal. So this Court can now draw legal conclusions it previously could not.

### A. The winner of each factor and the overall balancing are legal matters reviewed de novo.

In urging deference to the jury, Google advocates a role for the jury that bears no relation to the legal standard or the dozens of precedents the parties have cited that give courts primacy on fair use. The legal standard, which Google never mentions, is that "[f]air use is a mixed question of law and fact." *Harper & Row Publ'rs., Inc. v. Nation Enters.*, 471 U.S. 539, 560 (1985). Specifically, "the statutory factors … are legal in nature." *Fischer v. Dees*, 794 F.2d 432, 436 (9th Cir. 1986). The dispositive issues in fair use cases are almost never factual disputes, but rather "the ultimate application of th[e] facts"—a legal question this Court reviews "de novo." *Oracle I*, Appx116. Where, as here, the record contains "facts sufficient to evaluate each of the statutory factors, an appellate court … may conclude as a matter of law

5

that the challenged use does not qualify as a fair use." *Id.* (brackets and quotation marks omitted). That is why nearly every precedent that the parties discuss—30+ opinions—resolved fair use without a jury.

Having ignored the legal standard—and the broader lesson in all those appellate decisions—Google fashions a standard of review so narrow that it would have changed the outcome in most of those precedents. First, Google portrays each fair-use factor as a question of fact that the jury has broad latitude to resolve—even suggesting that a lone disputed fact precludes the court from performing its legal function. GB4-5, 35. Second, Google goes a step further, contending that the jury must "balance[] the factors." GB66. If either premise were correct, courts could only rarely decide fair use because a party can usually find some fact that favors it on one or more factors and rarely do all the factors point in one direction. *Infra* 8-9.

Rather, the jury's role on fair use is to resolve the disputed "*historical* facts" necessary to evaluate the factors—e.g., what was copied and how the copied material was used. *See Seltzer v. Green Day, Inc.*, 725 F.3d 1170, 1175-76 (9th Cir. 2013) (emphasis added). That means that this Court's deference to the jury does not entail deference

to the ultimate conclusion, but rather accepting as true any genuinely disputed historical fact favoring Google (because the jury is presumed to have resolved disputed facts in favor of the verdict) and considering those facts established along with all other "uncontradicted and unimpeached" evidence. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000); *Integra Lifesciences I, Ltd. v. Merck KGaA*, 496 F.3d 1334, 1345 (Fed. Cir. 2007). The Court then plays two critical legal roles.

First, this Court decides who prevails on *each factor* in light of the established historical facts. If Google adduced substantial evidence of a historical fact, this Court treats that fact as established for the purposes of determining who prevailed on the particular factor. OB25; GB35. But this Court does not treat the jury as "the ultimate arbiter" of the legal issue of who won that factor simply because the case went to a jury, for that would "abdicate [this Court's] guardianship role." *R.R. Dynamics, Inc. v. A. Stucki Co.*, 727 F.2d 1506, 1515 (Fed. Cir. 1984). That is why there are many cases where the Ninth Circuit, confronted with established or undisputed facts on both sides of a factor, resolves the factor as a matter of law on summary judgment. *E.g.*, *Seltzer*, 725

F.3d at 1177 (finding transformation even though "message and meaning of the original … is debatable"); *Wall Data Inc. v. L.A. Cty. Sheriff's Dep't*, 447 F.3d 769, 780 (9th Cir. 2006) (holding factor 2 favored plaintiff where work was "not purely creative"). That is what it means for each statutory factor to be "legal in nature." *Supra* 5.

Second, "a court" balances the factors, "apply[ing § 107's] 'equitable rule of reason' analysis to particular claims of infringement." *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 448 (1984). The Supreme Court, this Court, and the Ninth Circuit have repeatedly confirmed that the court determines the "ultimate conclusions to be drawn from th[e] facts." *Oracle I*, Appx116 (quoting *Seltzer*, 725 F.3d at 1175); *see* OB26-27 (collecting cases). Google's view that the jury "balance[s] the factors," GB66, cannot be reconciled with the many controlling Ninth Circuit cases in which courts conclude that different factors point in different directions, but nevertheless proceed to balance the factors. *E.g.*, *L.A. News Serv. v. Reuters Television Int'l, Ltd.*, 149 F.3d 987, 994-95 (9th Cir. 1998) (summary judgment of no fair use when "one of the four statutory factors" favored fair use); *Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 822 (9th Cir. 2002) ("Having … found

8

that two weigh in favor of Arriba, one is neutral, and one weighs slightly in favor of Kelly, we [find] fair use.").[2]

Google elevates rhetoric over logic in repeatedly emphasizing (*e.g.*, GB1, 66) how rarely appellate courts reverse fair use jury verdicts. The article Google cites for its statistics explains that courts almost never let fair use go to a jury: "fair use now stands as an issue of law for judges to decide." Ned Snow, *Fair Use As a Matter of Law*, 89 Denv. U. L. Rev. 1, 2 (2011). We found only four JMOL appeals on fair use from jury verdicts in the 23 years since *Campbell* in 1994. Blue moons occur far more often than that. Because the legal standard for taking fair use from a jury on summary judgment is the same as overturning a jury

---

[2] Contrary to Google's contention (GB66-67), Oracle did not waive its argument that the court balances the factors. Citing the same authorities this Court relied upon, *see Oracle I*, Appx116, Oracle informed the court that "[c]ourts routinely determine fair use as a matter of law," that the factors are "legal in nature" and can be resolved "without usurping the function of the jury," and that the court's role on JMOL was to draw "the ultimate conclusions" from the factual record, which plainly entails weighing the factors. Appx2065. Oracle also explained to the court how it should weigh factors against others. *E.g.*, Appx2065, Appx2067, Appx2072, Appx2085, Appx2077-2078 ("[E]ven if the secondary user only copies as much as is necessary for his or her intended use, then this factor will *not weigh against him or her*…."). It is absurd to suggest that Oracle had to argue specific permutations of factors on pain of waiving this Court's critical role in legal weighing. With six factors and subfactors, there are 64 possible permutations.

verdict, the dearth of jury verdicts is far more instructive of the role of courts in fair use.

Finally, Google frequently references the jury instructions (GB33, 44-45, 53) as if to suggest that they govern this Court's legal analysis. They don't.  "[W]hen reviewing a motion for judgment as a matter of law," courts must "apply the law as it should be, rather than the law as it was read to the jury."  *Pincay v. Andrews*, 238 F.3d 1106, 1109 n.4 (9th Cir. 2001); *see St. Louis v. Praprotnik*, 485 U.S. 112, 120 (1988) (plurality).

Under the proper allocation of roles, the facts established at trial entitle Oracle to judgment as a matter of law.

## B.    Factor 1: Google's purpose in copying was purely commercial and not transformative.

### 1.    Google's copying was entirely commercial.

Google's position on commerciality is a prime example of its confusion about the roles of the court and jury.  There is no dispute about the historical facts:  Google is a for-profit enterprise.  It has reaped billions of dollars in revenue from Android.  GB43; Appx1110; OB28-29.  Its business model is to proliferate Android by enticing manufacturers to incorporate it into devices for free so Google can draw

10

revenues from targeted advertising.  Appx50420-50421, Appx55465.

This Court has already decided the *legal* conclusion to draw from those

facts:  Google's use was "purely commercial."  *Oracle I*, Appx119.

Google nevertheless argues (GB44) that the commerciality of its

use does not meaningfully weigh against fair use for two legally

erroneous reasons.  First, Google contends that "the revenue benefit to

Google flows from the ad revenue generated by its search engine."

GB44.  But commerciality does not turn on the route the money takes

into Google's coffers:  "Direct economic benefit is not required to

demonstrate a commercial use."  *A&M Records, Inc. v. Napster*, *Inc.*,

239 F.3d 1004, 1015 (9th Cir. 2001); CCA Br. 9-11.

Second, Google argues that a jury could have concluded Android

"has non-commercial purposes as well."  GB44.  That is legally

irrelevant.  The question is "not whether the *sole motive* of the use is

monetary gain, but whether the user stands to profit from exploitation

of the copyrighted material."  *Harper & Row*, 471 U.S. at 562 (emphasis

added).  Google indisputably does.

Google's commercial use weighs strongly against fair use.

### 2.    Google's copying was not transformative.

On transformative use, too, the historical facts are undisputed: what declaring code is, what it does in Java and Android, how the audience (of developers) perceives it, how much Google took and added, what that added code does, and why Google used Java's declaring code. Resolving all genuinely disputed historical facts in Google's favor, Google's copying was not transformative, let alone transformative enough to offset Android's overwhelmingly commercial purpose. *See* OB29-30. Google's argument about transformative use (GB36-43) revolves almost entirely around the legal definition of transformative— which is a legal issue for this Court.

Google claims it is transformative simply to move a copyrighted work from one context to another. Applying this "new-context theory," Google claims that it transformed Oracle's work by using it "in a new context—Android, a platform for smartphones, not desktops." GB37-38. This argument fails as a matter of law for two independent reasons.

### a.    Smartphones were not a new context for the Java APIs.

First, the premise of Google's entire argument—that smartphones were a "new context"—is wrong as a matter of law. Google disregards

unrefuted evidence that the Java SE APIs were already in smartphones when Google released Android.  OB49-50.  Aside from Oracle's abundant evidence to that effect, *e.g.,* Appx50887, Appx51545, the head of Android testified (on direct by Google) that Danger smartphones contained Java SE and were equivalent to later Android phones. Appx50619.  No witness ever contradicted him.  There is no genuine dispute of fact.

Google now offers only general testimony that Java was not in smartphones from a witness who admitted on cross that his testimony failed to account for Danger and other smartphone manufacturers that licensed Java SE.  Appx50580-50581.[3]  Because that is not enough to permit a jury to disregard the undisputed Danger evidence, *see Reeves*, 530 U.S. at 151, Google's whole argument fails right at the threshold.

### b.     Moving the APIs to smartphones, even if a new context, was not transformative.

Even if smartphones are a "new context," Google's use is not transformative.  Google ignores settled law on when new contexts are—

---

[3] Elsewhere, Google asserts that Oracle's founder testified that Java SE "was not in the smartphone market."  GB60.  In fact, he testified only that Java was "*primarily*" in feature phones.  Appx55419.

and are not—transformative; impermissibly undermines Oracle's statutory right to create derivative works; and improperly exalts labels over law. We address each point in turn.

**_Settled law._** In the last appeal, this Court observed that "Google overstates what activities can be deemed transformative." *Oracle I*, Appx119. Google's legal arguments are the same—and remain overstated as a matter of law. A move from larger computers (PCs) to smaller ones (smartphones) is not the sort of shift in context that satisfies the legal definition of transformative. This, too, is a legal issue for this Court. *Mattel, Inc. v. Walking Mountain Prods.*, 353 F.3d 792, 801 (9th Cir. 2003) (transformation, there parody, "is a question of law"); *see Seltzer*, 725 F.3d at 1175 (deciding transformation on summary judgment despite divergent arguments about the works' purposes).

Everyone agrees on the overarching legal rule: "A work is not transformative where the user makes no alteration to the *expressive content or message* of the original work." *Oracle I*, Appx117 (quotation marks omitted); GB36-37. Thus, the question is whether Google altered

the "expression, meaning, or message" of the declaring code by copying it from the Java platform into Android. *Oracle I*, Appx117.

Moving material to a new context is not transformative in and of itself—even if the new home is a "sharply different context." *TCA Television Corp. v. McCollum*, 839 F.3d 168, 182 (2d Cir. 2016), *cert. denied*, 137 S. Ct. 2175 (2017). A use becomes transformative only if it alters the original's "expression, meaning, or message." *See Kelly*, 336 F.3d at 818, 819 & n.19 ("retransmi[ssion] in a different medium" not transformative, but using low-resolution thumbnail images for the distinct purpose of creating a searchable index is); *Gaylord v. United States*, 595 F.3d 1364, 1374 (Fed. Cir. 2010) (in reversing verdict, holding new context not transformative where "the purpose and character of the use[s] were identical").

Google fails to point to anything it did to imbue the declaring code with new meaning in smartphones. *See* NYIPLA Br. 9-17. And Google affirmatively makes the most powerful case against characterizing the new context as a change in expression by admitting that it used Oracle's work to attract Java programmers to Android so they would not have "to learn something completely new." Appx50632; GB15. That

15

is the epitome of a superseding use: "us[ing] [a work] to get attention or to avoid the drudgery in working up something fresh." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 580 (1994).

Google's only response is the *legal* argument that "Oracle errs in focusing exclusively on the declarations and their purposes." GB39. Google argues the transformative-use analysis should not focus on how Google used the code it copied but rather only on the purposes of the Java and Android platforms "as a whole." GB39.[4] Section 107, however, requires this Court to determine the "purpose and character of the *use*," meaning the *infringing use*—use of the copyrighted material that the defendant seeks to establish is fair. That use is Google's copying of the declaring code, structure, and organization from Java into Android. So the relevant question is what purpose the declaring code and structure and organization serve in each platform.

The case law is clear: "[T]he focus of inquiry is not simply on … whether [the new] work serves a purpose or conveys an overall expression, meaning, or message different from the copyrighted

_____

[4] Google cannot have it both ways. If the overall purpose of the platform is paramount, then Oracle is entitled to a new trial that includes evidence of Android's broad purpose. *Infra* 49-59.

material it appropriates" but rather "whether the new work uses the *copyrighted material itself* for a purpose, or imbues it with a character, different from that for which it was created." *TCA Television*, 839 F.3d at 180 (emphasis added). In *TCA Television*, for example, the plaintiff owned the copyright on the iconic "Who's on First?" routine, which the defendant copied and put in the "sharply different context" of a dramatic play. *Id.* at 181-82. The use was not transformative because it did not alter, but rather used, the original's "message" "so that the audience will readily recognize" the original, *id.*—the very objective Google admits. In so ruling, the court did not compare the stand-alone routine's purely comedic purpose with the new play's overall "dark critique of society." *Id.* at 181.

The Ninth Circuit applied the same principle to a very different work, where an author put the OJ Simpson murder case into a format "broadly mimic[king]" "The Cat in the Hat." *Dr. Seuss Enters., L.P. v. Penguin Books USA, Inc.*, 109 F.3d 1394, 1401 (9th Cir. 1997). The contexts were very different—the story of a brutal double murder versus the hijinks of a talking cat on a "cold, cold wet day." Yet the Ninth Circuit held that the use was not transformative. As here, the

17

reason was that the copyist used the original "to get attention" for its work, which "diminishes" any fair use to the point where it may "vanish" altogether. *Id.* at 1400-01 (quoting *Campbell*, 510 U.S. at 580). Contrary to Google's analysis, the Ninth Circuit considered the expropriated elements of the original in the new work: "the Cat's stove-pipe hat, the narrator, and the title." *Id.* at 1401 (parentheses omitted). It did not compare the overall purpose of the original (a whimsical children's story) to the fundamentally different purpose of the new work (recounting a tragic murder), as Google urges this Court to do.

*Derivative-work right.* Google's new-context theory is also wrong because it negates the copyright holder's statutory right to create derivative works. *See* OB32-33; NYIPLA Br. 17-20. Were a mere change in form transformative, all derivative works would be transformative. That is because, by definition, a "derivative work is … *any other form* in which a work may be recast, *transformed*, or adapted." 17 U.S.C. § 101 (emphasis added). The only way to balance transformative use with the derivative work right is to ask whether the *material that has been copied* has a different meaning or message in the

new work, not whether the new work as a whole has a different purpose.

Google argues Oracle's derivative work right is irrelevant because "fair use expressly applies to the right to create derivative works." GB42. But Google's own cases recognize that the derivative work right informs the uses that count as transformative. *See Video Pipeline, Inc. v. Buena Vista Home Entm't*, 342 F.3d 191, 199 (3d Cir. 2003) (that infringing use would "serve as substitute[] for ... derivatives" is "highly relevant" to finding use non-transformative); *accord Campbell*, 510 U.S. at 592 (finding parody transformative because "there is no protectable derivative market for criticism").

Courts have developed an instructive shorthand to distinguish between changes in form that are transformative and changes that impermissibly intrude on an author's derivative work right. Transformative uses tend to copy in order to communicate something "about" the original, *Authors Guild v. Google, Inc.*, 804 F.3d 202, 215-16 (2d Cir. 2015) (Leval, J.)—as a parody, critique, or news story does. Infringing uses, like Google's, merely present a "new way to exploit the creative virtues of the original"—i.e., simply take the author's creative

contribution from its original form (e.g., a book) and exploit it in a new form (e.g., a movie). *Blanch v. Koons*, 467 F.3d 244, 252 (2d Cir. 2006).

All the cases Google cites as transformative uses involve the secondary user changing the expressive value of the original in a way that did more than exploit "the creative virtues of the original work." *Id.* at 252-53 ("using [the original] image as fodder for … commentary on the social and aesthetic consequences of mass media"); *Seltzer*, 725 F.3d at 1177 (altering message of street art from "themes of youth culture" to criticism of "the hypocrisy of religion"); *L.A. News Serv. v. CBS Broad., Inc.*, 305 F.3d 924, 938-39 (9th Cir. 2002) (using news footage not transformative in news programming but mildly transformative as entertainment in opening montage).

That is particularly true of the software case Google features most prominently, *Sony Computer Entertainment, Inc. v. Connectix Corp.*, 203 F.3d 596 (9th Cir. 2000). There, the court found that copying the code was only "modestly transformative." *Id.* at 606. *Connectix* reached that conclusion because: (1) Connectix's commercial end-product contained *none* of Sony's copyrighted expression—the Ninth Circuit emphasized that Connectix created "a wholly new product" with

20

"entirely new … code"—and (2) the intermediate copying was performed to "produce a product that would be compatible." *Id.* at 606-07.  In other words, the intermediate copying was *about* the original because it was designed to discover underlying unprotected ideas to make its device work with Sony's games.  Even that "modest" level of transformation is far more transformative than Google's copying code verbatim into its commercial end-product to use Oracle's expression to attract programmers and device manufacturers to Google's new and incompatible platform.  GB2, 15; OB13.

**_Law beats labels._**  Google makes no additional headway with the refrain that Android transformed the Java APIs by incorporating them into the "first open-source, full-stack, mobile operating system."  GB2, 4, 75.  Stringing together adjectives to describe Android does nothing to demonstrate how Google's use altered the declaring code's expression or meaning.

First, Google contends (GB37-38) that it copied only some of Oracle's API packages and added some of its own.  But Google ignores the principle that it is not transformative simply to copy less than an entire work and/or to add other material which has no impact on the

expressive content or message of the original.  OB36-37.  Google's

argument that it copied *only* 37 of the 166 packages and added others is

no different than an author defending his plagiarism on the ground that

his new 166-chapter novel copied *only* 37 chapters from the original.

Google's use mirrors the classic unfair use in *Stewart v. Abend*, 495 U.S.

207, 238 (1990), where the defendants adapted a short story to a

feature-length movie, adding so much new material that the original

amounted to only 20% of the final.  OB32-33.

Second, Google touts its "full-stack operating system," without

saying what that means.  It means only that Google packaged together

an existing open-source operating system (Linux) with Oracle's Java

APIs.  Oracle's APIs always ran on top of *some* operating system.

Appx51403.  That Google marketed them as a single platform does not

affect the expression of the declaring code.  Indeed, SavaJe preceded

Android and was a full-stack mobile operating system using Java SE

APIs.  Appx51542-51543.

Third, contrary to Google's assertion (GB37), substituting

different implementing code does not transform the expression of the

declaring code or the structure and organization of Oracle's APIs.

Google does not dispute that the new implementing code leaves the declaring code's expression unchanged.  OB7-8, 10-13, 46.  Google did not transform the declaring code by adding different implementing code any more than a plagiarist transforms a novel by copying the topic sentence of every paragraph and paraphrasing the rest with all new "implementing text."

Most astonishing is Google's suggestion that it transformed Oracle's APIs by making them available for free under an open-source license.  GB38 n.4.  Taking someone's work and giving it away for free is piracy, not transformation.  *Napster*, 239 F.3d at 1015; *Harper & Row*, 471 U.S. at 569 ("Any copyright infringer may claim to benefit the public by increasing public access to the copyrighted work," but the "doctrine of fair use … does not sanction" such use.).

### 3.    Google's purported evidence of good faith does not count in favor of fair use.

Google devotes 16 pages to its supposed good faith.  GB3, 9-12, 17-19, 45-49, 68.  It is all wasted.  In contrast to trial, where Oracle could have defeated Google's defense by persuading the jury that Google acted in bad faith, Oracle has not pressed that threshold argument on appeal.  Google does not contest that bad faith is a one-way ratchet against fair

23

use, so its evidence of good faith cannot support the jury's verdict. OB28, 37-38.[5]

Yet Google makes a variant of the same argument, contending that the jury could have found "good faith based on industry custom" on the theory that Oracle's conduct shows a "reasonable" owner would have consented to Google's use.  GB49.  But the jury could not have reached that conclusion, because it received no such instruction.  A theory on which the jury "was not instructed … may not provide the basis for upholding the jury verdict." *Country Shindig Opry, Inc. v. Cessna Aircraft Co.*, 780 F.2d 1408, 1413 (8th Cir. 1986); *accord Wordtech Sys., Inc. v. Integrated Networks Sols., Inc.*, 609 F.3d 1308, 1313-14 (Fed. Cir. 2010) (applying Ninth Circuit law).

In any event, Google's argument is legally wrong.  Fair use does not consider the original author's conduct to determine whether there would be "hypothetical consent by a rational author." *Peter Letterese &*

---

[5] Google is wrong that Oracle sought a jury instruction that good faith favors fair use because the instruction refers to the "propriety of the accused infringer's conduct."  GB45.  Google truncates the sentence: "Also relevant to the first statutory factor is the propriety of the accused infringer's conduct *because fair use presupposes* good faith and fair dealing."  Appx1054 (emphasis added).

*Assocs., Inc. v. World Inst. of Scientology Enters., Int'l*, 533 F.3d 1287, 1308 n.23 (11th Cir. 2008).  It asks whether the fair-use factors are satisfied—and if so, a court is safe in concluding that a rational author would have consented.  *Id.*; *see Harper & Row*, 471 U.S. at 550 (fair use "has always precluded"—and thus the reasonable author would never be expected to approve—a competing commercial use "that supersedes … the original" (brackets and quotation marks omitted)).

Finally, there is one assertion that Google repeats so frequently—and so misleadingly—that we feel compelled to set the record straight: that Google copied in good faith because Oracle "made the … API declarations open and free for anyone to use without obtaining a license or paying a royalty."  GB9; *see* GB3, 9-12, 24-25, 45.  That is false. *Supra* 2.  No one could use the code without a license.[6]  Anyone who accessed the Java SE Specification, which is where the declaring code is reported, was on notice that the code was published subject to a license,

---

[6] Google's computer science "amici" brief is wrong for the same reason. It is also plainly improper:  The brief fails to disclose that two signatories—that we know of—were paid witnesses for Google in this case (Cattell and Phipps).  In addition, Bloch and Lee (who testified at trial) and at least 20 other signatories are current or former Google employees.

called the Specification License, strictly limiting the use of Oracle's APIs.  Appx51407; *see* Appx55456-55457 (license); *Oracle I*, Appx93. The record contains not a single example of Oracle actually letting a business make commercial use of its APIs for free.  Appx50568 ("Apache Harmony … entered into the specification license"); Appx55394-55395 (Oracle enforces licensing terms against Apache Harmony); Appx51687-51688 (Oracle enforcing copyrights to shut down unlicensed commercial use of GNU's research).  IBM and Oracle (before acquiring Sun) were the only companies in the record that used the Java APIs in a commercial platform, and both paid for commercial licenses. Appx51395-51396, Appx51411; Appx51429.

## C.    Factor 2: Oracle's APIs are indisputably creative.

The Ninth Circuit has held that factor 2 "typically has not been terribly significant in the overall fair use balancing." *Dr. Seuss*, 109 F.3d at 1402; *see* 4 Nimmer on Copyright § 13.05 (2017) ("[T]his second factor more typically recedes into insignificance in the greater fair use calculus.").  Whatever the weight, it favors Oracle.

Google ignores half the question on factor 2—and a dispositive half at that.  Google copied both the "declaring source code" and the

"structure, sequence, and organization" of Oracle's APIs. Google had to address factor 2 as to *both*, but addresses only the declaring code. Google cites no evidence challenging the highly creative nature of the structure and organization of the APIs it copied.

That omission alone resolves factor 2 for Oracle. As the Ninth Circuit recognizes, much of "[t]he expressive element of software lies … in the organization and structure of the … code." *Connectix*, 203 F.3d at 606. Where "there are many possible ways of accomplishing a given task …, the programmer's choice of program structure and design may be highly creative and idiosyncratic." *Sega Enters Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1524 (9th Cir. 1992). It is undisputed that there was nothing preordained in the intricate hierarchy and interrelationships between and among the packages, classes, interfaces, and methods, Appx51852 (Stipulation); *Oracle I*, Appx104, Appx111, and that Java's developers settled on the structure and organization from "a vast range of options," *Oracle I*, Appx99, through a "design process" Google's Java guru admitted was an "art, not a science," GB52 (citing Appx51009). Google does not even try to explain how the result of an artistic process with a vast range of options could be anything but highly creative.

27

Even the half argument Google does offer—about the declaring code—is flawed.  Our opening brief demonstrated (OB8, 39) that the declaring code is highly creative.  Google cannot negate the creativity of the thousands of lines of code by focusing on individual declarations, GB50-51.  *See Oracle I*, Appx106 (rejecting similar Google argument regarding copyrightability).

Google argues that the "jury could reasonably have found that the functional elements" in Oracle's work meant that it "did not fall near the core of copyright protection."  GB50-51.  Those "functional aspects" are, as this Court recognized, the idea of organizing APIs with the package-class-method hierarchy and the specific functions the APIs perform.  *Oracle I*, Appx118-120.  But Google did not limit its copying to those functional elements.  Rather, Google copied the creative portions of Oracle's APIs for their creative value.  GB15.  In such circumstances, a work's functional elements do not weigh against fair use.  *See Harper & Row*, 471 U.S. at 563 (contrasting copying factual passages of biography to access factual information—which may support fair use— with copying expressive passages that also contain factual information—which does not).

Moreover, Google fails to meaningfully distinguish *Wall Data*, 447 F.3d 769. The code there served a functional purpose: "allow[ing] personal computers that use one operating system to access data stored on computers that use a different operating system." *Id.* at 774. Yet the nature of the code weighed against fair use—on summary judgment. Google says this case is different because it added its own implementing code, GB53-54, but it fails to offer any explanation of how the code in *Wall Data* was any less functional or more creative than the code Google copied. That was not a jury question there—nor is it here.

Factor 2 favors Oracle.

## D.    Factor 3: Google indisputably copied important Java features.

Google admits in its introduction (as its witnesses did at trial) a fact that moves factor 3 squarely into Oracle's column: Google selected and copied what it "determined to be key for mobile phones," GB2— what it considered most important to tap into Java's fan base of developers, device manufacturers, and mobile carriers and to produce Google's own smartphone platform, GB15. That alone proves "the qualitative value of the copied material, both to [Oracle] and [to

Google,] who seeks to profit from marketing [Oracle's] copyrighted expression." *Harper & Row*, 471 U.S. at 565.

### 1. Google's copying was substantial by any measure.

Google's main argument is that 11,330 lines of declaring code is a small mathematical percentage of Java. GB54-55. But Google cites no case that has ever found copying so much protected material to be insubstantial. *Cf. Elvis Presley Enters., Inc. v. Passport Video*, 349 F.3d 622, 625 (9th Cir. 2003) (copying 30-second video clips from extended performances weighs against fair use). Google also has no response to the point (OB43) that it copied 100% of the structure and organization of the 37 most important packages for mobile. As depicted in red on the software map (OB45), no reasonable jury could conclude that Google's copying is insubstantial.

More important, percentages are not dispositive on factor 3 where the copying was qualitatively significant. OB44; *Harper & Row*, 471 U.S. at 569 ("[I]n finding the taking 'infinitesimal,' the Court of Appeals accorded too little weight to the qualitative importance of the quoted passages of original expression."). Google has no answer to *Harper &*

*Row*, where the Supreme Court held copying 300 words from a 655-page work (0.15% of the original) substantial. *Id.* at 566.

On the qualitative dimension, Google's concession—that it copied what was "key for mobile phones," GB2—proves that its copying was highly substantial. The declaring code is what programmers see, know, and care about. OB7-8, 10-13, 46. It is what makes Java, Java. Thus, it is the reason Google was able, in its expert's words, "to leverage the existing community of [Java] developers." Appx51274. And it is how Google was able to tout these packages to potential customers as Android's "Core Java Libraries." OB14.

Google falls far short in protesting that it did not copy the "heart" of Java. GB3. We need not debate whether what Google copied was the "heart," or merely the lungs, liver, or legs. What matters under factor 3 is that it was "key," which means it was highly substantial.

The only evidence Google points to is the statement of Oracle's chief Java architect that, to developers *creating API packages*, the implementing code can be *as* important as the declaring code. GB55-56 (citing Appx51477). That is like saying a heart is not important, because you can't live without a head. Of course the implementing code

31

is also important.  But to Google's fan base, the app developers (which is

the relevant focus), the declaring code played a "key role," *Harper &*

*Row*, 471 U.S. at 566—and that is more than enough to prove the

qualitative significance of what Google copied.

> **2.    Google's justifications for the copying are**
> **irrelevant to fair use as a matter of law.**

Google's two remaining arguments rest on claimed justifications

for copying: (1) "intersystem consistency" and (2) necessity to use the

Java programming language.  Unlike criticism, comment, news

reporting, and researching, *see* 17 U.S.C. § 107, neither of Google's

rationales is "a legitimate" justification for copying, and therefore

neither can be a legally permissible basis for resolving factor 3 in

Google's favor.  *Campbell*, 510 U.S. at 586-87; *accord Oracle I*, Appx119.

*Inter-system consistency.*  Google tries to justify the degree of

copying on the ground that it "used 'just enough to preserve inter-

system consistency in usage.'"  GB54 (quoting Appx45).  To be clear,

Google is no longer making the argument it once advanced about

interoperability, for as this Court noted, Google designed Android to be

*incompatible* with the Java platform, *Oracle I*, Appx94, forever

fragmenting the Java developer community, OB13.

Rather, "inter-system consistency" is a euphemism for Google's commercial interest in "capitaliz[ing] on the fact that software developers were already trained and experienced in using the Java API packages at issue." *Oracle I*, Appx114-115. It is a reincarnation of Google's failed argument that "copyrighted works lose protection when they become popular," *Oracle I*, Appx115—and it fares no better here. No one would say that it is fair for a movie director to set his new movie to the "Sound of Music" soundtrack, because those are the songs his band knows by heart.

As with factor 1 (at 13-21), copying to capture the original's customers is the essence of superseding use and the antithesis of fair use. *Micro Star v. Formgen Inc.*, 154 F.3d 1107, 1113 (9th Cir. 1998) (attracting original's fan base by using the "story's unique setting, characters, [and] plot" not fair use); *Castle Rock Entm't, Inc. v. Carol Pub. Group Inc.*, 150 F.3d 132, 143-44 (2d Cir. 1998) (using protected elements of a TV series in a trivia book to "satiate *Seinfeld* fan's passion" and capture the fan base not fair use).

***Necessity to use the Java language.*** Google also argues that factor 3 supports fair use because the copied APIs were supposedly

33

"necessary" to use the Java programming language.  GB55, 57.  Google is alluding to this Court's observation that copying packages that were "essential components of any Java language-based program" might support fair use.  *Oracle I*, Appx120.  But Google is no longer accused of infringement for copying the 170 lines of code that the parties stipulated were necessary to use the Java language.  Appx51444-51446. So any need to use those 170 lines cannot justify copying the remaining 11,330.

Google suggests (GB55) that maybe some of those 11,330 lines were also necessary to use the Java language.  But there is no evidence that any of those lines were necessary, and numerous Google witnesses testified they were not.  Appx51270, Appx51546-51548.  Even here Google does not suggest that the 11,330 lines were necessary—much less that their structure and organization was too.[7]

---

[7] Google invokes an isolated statement that the APIs were "integral" to the language.  GB55 (citing Appx50979).  But the witness did not contradict Google's other witnesses and say the code was technically necessary to use the language.  Other testimony Google cites (Appx50987-50990) was stricken from the record.  Appx2442 (stipulation); Appx51337.

Rather Google argues that, even if only 170 lines of code were necessary, it was fair to copy more because "there was no obvious way to distinguish [the] necessary from [the] unnecessary."  GB55.  Google does not explain how that justifies taking every line—and the structure and organization.  It would be like your neighbor annexing your entire home on the ground that he wasn't sure exactly where the property line was.  In any event, this argument has nothing to do with *Google*'s copying.  Google never suggested at trial—or now—that it copied the additional 11,330 lines because *it* mistakenly believed those lines were necessary to use the Java language.

### E.    Factor 4: Google's copying harmed both the actual and potential markets for the Java platform and its derivatives.

Factor 4 presents Google with a huge challenge.  Rare among copyright plaintiffs, Oracle presented multiple concrete examples of market displacement in *actual* markets and harm to *potential* markets representing the natural progression for Oracle's work.  OB49-50.  Meaningful harm to either tips this factor in Oracle's favor as a matter

of law.  OB47-48 (collecting cases).[8]  So Google had to defeat each of

Oracle's demonstrations of harm—and establish that the market for

Java SE and its derivatives would remain unharmed if everyone did

what Google did.

Google does not even try.  First, as to actual markets, Google

cherry picks certain harms to rebut, leaving other concrete instances of

harm unrebutted—any one of which is dispositive.  *Harper & Row*, 471

U.S. at 567.  Second, addressing only markets Java already occupied,

Google completely ignores the unrebutted evidence of Java's *potential* in

other markets.  Harm to potential markets is alone sufficient to decide

this factor for Oracle.  OB47-48 (collecting authority).  Third, Google

fails to refute the harm from the widespread copying that would result

if its use were permissible, another dispositive inquiry.

---

[8] Google erroneously invokes *Connectix*, 203 F.3d at 607-08, for the proposition that "[a] defendant need not show that markets were wholly unaffected."  GB59.  The competing product that went to market in *Connectix* did not itself infringe.  203 F.3d at 606-07.  The infringement consisted only of intermediate copying to learn more about the format. Under that unique circumstance, the court held that competition from the *noninfringing* product would not necessarily weigh against fair use.

## 1.   Google does not dispute evidence of market substitution in markets Java SE already occupied.

Google succinctly captures the key disagreement regarding the markets Java SE was already occupying:  "Oracle claims there was 'undisputed evidence that the markets [for Android and Java SE] overlap,'" whereas Google protests that Android caused no harm because there was zero overlap:  Java SE "was designed and licensed for use on desktops and servers, and Android for use with smartphones," and never the twain did meet.  GB60.

Google is wrong about the record.  Google's Android chief testified that Android and Java *are* "competitor[s]" in "the same industry with similar products."  Appx50844.  He knew what Google now denies: Unrebutted evidence showed that Java SE was on smartphones and tablets.  *Supra* 13; OB17-19, 49-50.

We address just a handful of the examples of actual market harm to Java SE that are uncontroverted in the record and establish market harm as a matter of law.  That is much more than is needed, because factor 4 favors Oracle if Android and Java competed for one product. *Harper & Row*, 471 U.S. at 567; *L.A. News Serv.,* 149 F.3d at 994.

***Tablets.***  Google does not dispute the clear-cut evidence of market overlap and harm in tablets:  Amazon ping-ponged from Java to Android and then back to Java SE after leveraging Android to demand a 97.5% discount from Oracle.  OB19, 50.  Google's only response is the attorney argument that the jury could have discounted this testimony, because "the J2SE APIs were also free through OpenJDK."  GB62.  No evidence supports any such inference.  Amazon switched from Java to *Android*—not to OpenJDK.  And Amazon then returned to Java SE at a massive discount, using *Android* (not Open JDK) as its leverage.  Appx51361-51363.

The only evidence Google cites to support its OpenJDK argument is not even about OpenJDK or Amazon.  Oracle's expert simply acknowledged that "[a]s a *theoretical matter*[,] … open source software and open interfaces *could* affect revenue."  Appx51878 (emphasis added).  The specific evidence the jury heard with respect to OpenJDK—including from Sun's Head of Global Software Sales and Google executives—was that OpenJDK did not affect revenue because it was not a commercially viable alternative to using Java SE in

commercial products.  OB53-54.  That is why Google rejected it and
Amazon did not consider it.  *Id.*

**Smartphones.**  Google is wrong about smartphones too.  Once
again, Google ignores Danger at its own peril.  *Supra* 13.  There was no
dispute that Java SE was already in Danger smartphones when Google
released Android.

Google also improperly discounts the harm to SavaJe.  Google
does not dispute that SavaJe was a full-stack, licensed Java-SE-based
platform.  OB50; *see* Appx51543.  Google merely makes a carefully
worded observation that SavaJe "failed … before Android's *release*."
GB61 (emphasis added).  Google does not contest the undisputed
evidence as to why SavaJe failed (OB50):  *Pre*-release word of Android's
*development* caused investment in SavaJe to evaporate, as Android's co-
founder admitted.  Moreover, none of the 12 pages of testimony Google
cites (GB61) even mention SavaJe.  Google also contends Sun did not
consider SavaJe phones to be smartphones.  GB61.  That is wrong,
Appx55458, Appx55476, but, more importantly, irrelevant.  If, as

demonstrated, Android put SavaJe out of business, that is market

harm, regardless of what kind of phones SavaJe was in.[9]

### 2. Evidence of harm to potential markets for Java SE remains undisputed.

With respect to potential markets, Google states the right test, but

never applies it.  GB58-61.  Google had to demonstrate that its copying

caused no harm to Java SE and its derivatives in any potential market

that was "traditional, reasonable, or likely to be developed."  GB58-59.

Oracle identified at least two such markets: (1) Java SE on mobile

---

[9] None of this harm depends on Java ME; it all impacted Java SE. Because harm to Java SE so clearly establishes that factor 4 favors Oracle, we need not focus on harm to Java ME.  We note, however, that Google is wrong (GB64) in denying that Java ME is a derivative of Java SE 1.4 and 5.0.  The undisputed record was that Java ME was "regularly update[d] … to track the development of Java SE," specifically SE 1.4 and 5.0.  Appx51671.  Moreover, a copyright holder can assert its interests in earlier works (which is how Google characterizes Java ME) that are incorporated into the later work (Java SE 1.4 and 5.0).  *Gamma Audio & Video, Inc. v. Ean-Chea*, 11 F.3d 1106, 1112 (1st Cir. 1993); *accord DC Comics v. Towle*, 802 F.3d 1012, 1024 (9th Cir. 2015) ("[I]f the material copied was derived from a copyrighted underlying work, this will constitute an infringement of such work regardless of whether the defendant copied directly from the underlying work, or indirectly via the derivative work." (quoting 1 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 3.05, 3-34.31 (Matthew Bender, Rev. Ed.))).

devices with increasing computer power and (2) an updated smartphone platform derived from Java SE.  OB50-51.

Undisputed evidence established that Java SE's move to smartphones, through either path identified above, was traditional, reasonable, and likely:

- Java was dominant in mobile phones before Android, holding 80% of the market.  OB9.

- SavaJe had already taken the next step and used Java SE in a licensed full-stack mobile operating system.  Appx55461.

- In Java ME, Oracle demonstrated it was willing and able to adapt Java SE to mobile uses.  OB7.

- Sun's former CEO and Google's witness (Schwartz) was unequivocal—and undisputed:  "Absolutely" Sun considered "building a full-stack smartphone platform based on Java" and "had the foundation technologies to make it work." Appx50559-50560; *accord* Appx51798; OB9.

That last point alone establishes that the market was a reasonable one. *See Worldwide Church of God v. Phila. Church of God, Inc.*, 227 F.3d 1110, 1119 & n.2 (9th Cir. 2000) (finding potential market for annotated work where author contemplated creating such a work in the future).

In the face of all this, Google has not suggested, or provided any evidence, that it was unreasonable for Oracle to expect Java SE to be in the smartphone market *in the future*.  Instead, Google offers two

explanations for why smartphone manufacturers chose Android over Java *at the moment Android was released*: (1) Java SE was too big to run on smaller computers like smartphones and (2) it lacked key smartphone functions.  GB37.  Even if true, that would only explain why Sun had not *yet* developed Java SE into the optimum platform for the next generation of smartphones—i.e., why such phones were not *yet* current *actual* markets.  But Google says nothing—and cites nothing— to prove they were not *potential* markets.  GB60-63.

To start with Java SE itself, if the problem was that the platform was too big to run on smartphones with limited processing power (despite Danger as an unrebutted counter example), that was no hindrance to the *potential* market in which smartphones would exceed the processing power of many PCs.  Indeed, as mobile devices gained greater computing power, Java SE expanded to new devices, like Amazon's "more powerful" tablet.  Appx51771; *accord* Appx51617- 51618; OB19.  Nor does Google explain why there was no potential market for a Java SE derivative better optimized for smartphones.  Every witness who testified on the question said modifying Java SE for smartphones was a natural extension of that work.  Appx50559-50560,

Appx51798.  *Cf. Napster*, 239 F.3d at 1017 ("lack of harm to an established market cannot deprive the copyright holder of the right to develop alternative markets for the works").

Google gets nowhere with the assertion that Oracle never ended up building a smartphone device or releasing a smartphone platform. GB60-61.  As Google concedes, potential markets include copyright owners "licens[ing] others to develop" derivatives.  GB58 (quoting *Campbell*, 510 U.S. at 592); *accord* OB60-61.  Sun was already licensing Java SE to SavaJe in that space.  Appx55461.[10]

Oracle stood to secure significant licensing revenues from other businesses that wanted to use the Java APIs to develop their own platform.  As proof of the potential licensing market, one need look no further than Google.  OB11.  Struggling to develop its own platform from scratch, and despairing that the alternatives "all suck," Appx54012, Google was willing to pay Oracle hefty sums to make a derivative of Java SE.  OB12.  Licensing Java SE was a potential

---

[10] Accordingly, it is irrelevant that Oracle was not a "device maker." GB61.  Oracle's business is software, not building handsets for phones.

market, and no one testified otherwise.  Google's failure to say a word about this potential licensing market is fatal on factor 4.

Aside from licensing—focusing on Oracle's potential to develop its own smartphone platform—Google's point that Oracle had not *yet* been able to develop a smartphone platform is irrelevant.  By definition a potential market is one that the owner has not yet exploited.  And a market remains a potential market even where the copyright owner chooses not to market its work or is unsuccessful in doing so.  OB54-55 (citing *Worldwide Church*, 227 F.3d at 1119; *Micro Star*, 154 F.3d at 1113; *Napster*, 239 F.3d at 1017).  In *Campbell*, for example, there was no evidence that Orbison had the versatility to transcend his rock genre and craft a rap version of *Oh, Pretty Woman*; yet rap derivatives were "a proper focus of enquiry."  510 U.S. at 593-94. "Only [the copyright holder] has the right to enter [the] market [for derivative works]; whether it chooses to do so is entirely its business."  *Micro Star*, 154 F.3d at 1113 (quoting *Stewart*, 495 U.S. at 237).

### 3. Google cannot disprove the market harm from widespread copying akin to Google's.

To prevail on factor 4, Google also had to prove that "widespread" copying of Oracle's work akin to Google's copying would not harm Java

44

SE and its derivatives.  OB51-52.  The Supreme Court mandates this analysis because if Google's copying is fair use, so too would be similar copying by others.  Thus, it is important to assess whether an infringement, if upheld as fair use and "multiplied many times, become[s] in the aggregate a major inroad on copyright that must be prevented."  *Harper & Row*, 471 U.S. at 569 (quotation marks omitted). Here, the evidence was undisputed that widespread copying would be devastating to Oracle.  Oracle's CEO testified that if such copying became widespread, Oracle would be out of business.  Google's CEO and founder both agreed.  OB51-52.

Google's only response is that Oracle's APIs were "free and open" for everyone to copy.  GB63.  Even putting all of the demonstrated inaccuracies of such arguments aside, *supra* 25-26, harm to the business from widespread copying comes from *commercial* copying. Google cannot cite a single example of unlicensed commercial use of Oracle's APIs—except Android.

Google tries to diminish the importance of this test (GB62-63), but the case law is unequivocal that factor 4 counts in Oracle's favor unless Google points to substantial evidence that the "challenged use" would

not "adversely affect the *potential* market" for the work and its derivatives. *Harper & Row*, 471 U.S. at 568 (quotation marks omitted); OB51-52. Indeed, the Ninth Circuit has faithfully applied this precedent, finding factor 4 for the plaintiff based solely on the consequences of widespread use. *See Wall Data*, 447 F.3d at 781.

## F. Consistent with the purposes of copyright, the balance of the factors weighs against fair use as a matter of law.

The undisputed historical facts underlying each factor entitle Oracle to judgment as a matter of law—and the balance of factors most certainly does (OB27). That is the result that best furthers the purposes of copyright. "[T]he Framers intended copyright itself to be the engine of free expression." *Harper & Row*, 471 U.S. at 558. It is supposed to supply original authors, like Oracle, with "the economic incentive to create and disseminate ideas" by "establishing a marketable right to the use of one's expression," in both present and future forms. *Id.*; *accord Campbell*, 510 U.S. at 593 ("the licensing of derivatives is an important economic incentive to the creation of originals"). And to balance this right with the interest in promoting innovation, it leaves others free to build on the unprotected ideas in

each work to make new creative works. Thus, as the former Register of Copyrights explains: Google could have "promot[ed] creative innovation" and furthered the purposes of copyright by "leverag[ing] its thousands of expert computer scientists … to develop *better* APIs." Oman Br. 19. Google chose to copy instead.

Google claims that *it* is the innovator. Google is free to brag that it was able to achieve what Oracle had not yet achieved. We will never know what would have come of Oracle's plans to build a smartphone platform—or to license others to do so—because the give-away of Oracle's code slammed the door on both options. In any event, the Copyright Act has a legal answer to Google's claim: The Act reflects Congress's judgment that innovation is best served by not letting copyists "tell copyright holders the best way for them to exploit their copyrights." *Sony*, 464 U.S. at 446 n.28.

Google worries that rejecting fair use makes it "impossible to ever duplicate declaring code as fair use." GB41. That ignores our list of situations where copying declaring code would be fair (OB34-35), not to mention *Connectix*, the reverse-engineering case Google features prominently. Moreover, holding that it is improper to copy declaring

code for the same purpose for which it was written in a competing commercial product would not harm innovation. It has never been fair to copy a work and put it to the exact same use at the expense of the original. *Harper & Row*, 471 U.S. at 550. As with all other literary works, the original author cannot block anyone else from achieving the same goals—or expressing the same ideas—with her own code. And there are innumerable ways to achieve the same functions with code. Copyright simply prohibits a plagiarist from copying the same code and organization.

In the end, all agree: "There is no reason to treat software differently" from other literary works. GB40. An author who copies 11,330 topic sentences from a novel and paraphrases the rest to tell the same story is not fairly using the original. Nor is a filmmaker who adapts an 11,330-line short story into a feature-length film, or a playwright who takes a highly recognizable (but short) skit and inserts it into an otherwise new play. As in each of these situations, wholesale copying of thousands of lines of code embodying the entire structure and sequence of a work put to the same use in a competing work is not fair use.

## II.    At A Minimum, Oracle Is Entitled To A New Trial.

For a window into how unfair this trial was, one need look no further than Google's JMOL argument to this Court.  As it did at trial, Google builds its defense around the proposition that Android and Java have different purposes and serve different markets.  On factor 1, Google's transformation argument is that Google "create[d] a new work in a new context—Android, a platform for smartphones, not desktops and servers," GB37—and Google created Android "for a different purpose (smartphones)" than Java (PCs), GB42; *accord* GB37-38.  Similarly, on factor 4, Google's basis for arguing that Android inflicted no market harm on Java is that "Android did not supersede J2SE in the market because they were … 'on very different devices.'"  GB60; *accord* GB60-62.  Those were Google's central themes at trial.  *Infra* 54-55.

Google does not dispute that both themes were false.  Android was not for smartphones, alone, but for all sorts of devices on which the Java platform was already running.  And throughout discovery and trial, Google had imminent plans to put Android on PCs.  Google does not dispute that had the jury learned the truth, the trial would have been very different.

But for two reasons, the jury never learned the truth.  First, the district court excluded all evidence of Android's purpose and market effects beyond smartphones and tablets.  OB56-66.  Second, Google misled Oracle, the jury, and the court about Google's plans to run Android on PCs.  OB66-74.  For those two independent, though mutually reinforcing, reasons—and additional evidentiary errors—the verdict cannot stand.

### A.    The district court erred in banning evidence that Android is a software platform that competes with Java across devices.

Google significantly narrows the dispute over the district court's exclusion of evidence showing that Android is a multi-device platform like Java.  Our opening brief demonstrated that § 107 requires assessment of all purposes for, and market effects of, an infringing use.  OB60-61, 64.  Google does not dispute—and, indeed, embraces—that principle.  GB39 (urging the Court to examine each platform "as a whole").  That is why the Supreme Court has routinely analyzed together all forms into which an infringing work may be incorporated regardless of the medium.  *Campbell*, 510 U.S. at 573 (analyzing together implementations of infringing song in "records, cassette tapes,

and compact discs"); *Stewart*, 495 U.S. at 213, 237-38 (conducting unitary fair-use analysis of movie released "in a variety of media," including multiple theatrical prints, videocassettes, videodiscs, and cable television).  Thus, if the excluded evidence is probative of the purpose and market effects of Google's infringing use, then all agree it was relevant to the § 107 inquiry.  And that means it could not be excluded unless the risk of prejudice substantially outweighed its probative value.  *See* Fed. R. Evid. 403.

Google makes two arguments.  First, it asserts that the above rule is inapplicable.  It insists the newer devices are irrelevant because each device containing the Android platform is a different infringing use, requiring a different fair use analysis.  Second, it asserts that case-management concerns justify the exclusion of otherwise highly relevant evidence.  Both arguments fail.

> **1.  The evidence of different markets for the infringing Android software platform was highly relevant.**

The flaw in Google's argument that each device is a distinct use of Oracle's work is that it focuses on the wrong act of infringement. *Google* infringed when it copied Oracle's APIs from the Java platform

into the Android platform.  From the beginning, this case has been

about software, not hardware.  As this Court explained, the "use" at

issue is Google's use of "the 37 [Java API] packages" in the Android

"software platform."  *Oracle I*, Appx93; *see* Appx408 (Oracle's complaint)

("Google's Android infringes Oracle America's copyrights in the Java

platform.").[11]  It is *that* use that Google must prove is fair.  The Android

platform is designed for multiple devices.  Once Google puts the

declaring code in the platform, various manufacturers then use that

infringing software in their devices.  Each type of device represents a

market for the infringing software, just as CDs and cassettes represent

different markets for an infringing song.  *Google's* infringement in

creating the Android platform is the same whether the Android

software is on a Samsung smartphone or a Sony TV.  Each additional

---

[11] Google is wrong that the verdict in the first trial was limited to two "Android products[:] … smartphones and tablets."  GB70.  The document it cites (Appx1851) confirms that the first jury considered specific "Android versions," not specific devices.  Similarly, Google points to nothing in this Court's opinion that supports its argument (GB71) that this Court limited its remand to Android software as deployed in smartphones and tablets.

device is evidence of the broader purpose and varied market-effect of Google's illicit copying, and thus relevant to factors 1 and 4.[12]

Google largely agrees with these premises. It concedes that Android "isn't the hardware" but "the software … inside." Appx50292. It acknowledges that it stipulated that the infringing Android platform includes "the Android versions presented at the first trial and six newer version releases." GB72. It does not dispute that it designed the latest versions of Android to run Android and its apps across a wide assortment of devices, including TVs, cars, and wearables. OB58; *see* GB72. Nor does Google dispute that from the moment Oracle filed its supplemental complaint identifying the new markets, and throughout months of discovery thereafter, all agreed that the new markets were properly in the case. OB60-61.

Google contends that it "never conceded that any other Android *products* infringed," and that its stipulation about Android versions "had nothing to do with … Android *products* in other devices." GB72 (emphasis added). But Google offers no contrary argument why its act

---

[12] Because Oracle challenges a single use, the cases Google invokes—all involving multiple different acts of infringement—are irrelevant. GB74-75.

of infringement—copying Java APIs into the Android platform—

changes depending on the device in which the software is loaded.

Google simply pronounces that the "evidence in the record …

contradicts the assertion that these were just the same products in a

different context." GB74 (citing Appx1978-1979; Appx1990-1992). The

five transcript pages Google cites are not evidence at all—but lawyer

colloquy—and they address only Android Auto, explaining that it can

run either on the car or as "an app *on the [Android] phone*" that is

"plug[ged] … into the [car] through a USB cord." Appx1990 (emphasis

added). Far from establishing Android Auto as distinct from the

infringing Android platform on phones, Google's argument confirms it is

the same. *See* Appx1984. But the district court excluded even that

from trial.

What the court excluded was direct evidence of Google's use of

Java that struck at the core of Google's defense on factors 1 and 4. The

relevance to transformative use could not be starker (OB58-59). Had

Oracle been allowed to prove that Android, like Java, is a single,

comprehensive, multi-device platform that transcends particular

hardware, Google would not have been able to argue that it transformed

the declaring code because Android and Java had very different purposes and worked on different devices.  GB37-38, 42; *see supra* 49; OB31-32, 59, 67-69.  The jury would have understood that the larger purposes are the same and Google transformed nothing.

As to factor 4, Google says nothing to refute our central examples of relevance: (1) the Android platform competed with, and supplanted, the Java platform in multiple markets beyond smartphones; (2) such evidence would have demolished Google's argument that there was no market harm because Java SE was "[n]ever for smartphones," Appx50287; *see* Appx52125; Appx52127; and (3) the broader market evidence would have demonstrated that Android poses a greater "comprehensive threat" to Java.  OB59-60.

Finally, Google argues that these other markets are all irrelevant because the *Java products* used Java ME, rather than Java SE.  GB76.  Google's argument is off base.  What matters is that *Google's* platform uses the copyrighted work by incorporating Oracle's APIs, and thereby harms actual or *potential* markets for Oracle's work.  OB59.  Google causes harm by using those APIs in a competing platform in the same

markets in which Oracle licenses the Java platform, and in markets in which it may license in the future.

### 2.   The district court's case-management concerns cannot justify excluding highly relevant evidence.

Since the evidence was relevant to the central disputes on the two most important fair-use factors, the district court had to identify some prejudice that "*substantially* outweighed" admission of the evidence. *Obrey v. Johnson*, 400 F.3d 691, 698 (9th Cir. 2005) (emphasis added). Google's response confirms the court committed error upon error in this analysis, each of which constitutes an abuse of discretion.

First*,* Google tacitly concedes the district court failed to conduct the required balancing at all.  Google argues only that balancing was unnecessary because "the court determined that the evidence was not relevant." GB75.  But, as demonstrated, that determination is wrong. Thus, the court necessarily failed its obligation to weigh the evidence's probative value.  OB65.

Second, Google parrots the district court's incorrect concern about a trial-within-a-trial.  GB73.  This argument too is based on the flawed assumption that the same Android software that would infringe in one

device somehow would not infringe in another. *Supra* 52-55; OB62-63.

That the Android software infringes (absent fair use) was already

proven or conceded; there was no need for additional infringement

trials.

Moreover, Google does not dispute that where a court excludes

relevant evidence based on a concern that it will require a mini-trial,

the court must consider whether a mini-trial is actually necessary.

Google acknowledges that the court refused to consider Oracle's proof

that a mini-trial would be unnecessary, GB73, insisting instead that the

court reasonably refused Oracle's request because it came too late,

GB72.  Google has no response, however, to our point (OB62) that any

delay was due to the court's unprompted about-face six months after it

accepted Oracle's supplemental complaint.

Third, Google fails to meaningfully defend the court's conclusory

assertion that a trial accounting for the broader purpose of Android and

the multi-pronged market would have "multipl[ied] the number of

witnesses and volume of evidence beyond reason."  GB71-72.  As Oracle

told the court, it was "perfectly prepared" to present the evidence within

the time limits the court had set.  Appx1987, Appx1993.  That is

because explaining Android's expansion to new devices entails nothing but a broader description of the various Android-based devices and how they compete with Java. Oracle could have covered it with slightly more testimony from a fact witness on Oracle's various markets and brief testimony from an already-testifying expert about material in his report regarding competition in those markets. Appx2345-2347, Appx2375-2389, Appx2421-2438.

Google's argument boils down to a hollow invocation of "discretion" in the name of "case-management concerns." GB70-72. But discretion must be reasoned and exercised consistent with "fairness and justice." 11 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2803 (3d ed. 2008). There is nothing fair or just in giving the jury half the story about Android's purpose and market harm—the two most important factors.

### 3.    Google fails to refute Oracle's showing that it was severely prejudiced.

Google does not dispute that the excluded evidence would have forced it to completely change its theory on factors 1 and 4. Yet Google asserts that Oracle suffered no prejudice "because [Oracle] remains free to pursue infringement claims arising from other Android products in a

separate proceeding and trial." GB73. But the prejudice here is the effect of the district court's error on the verdict in *this* case: that the jury received a misleading half story that supported Google's themes and excluded Oracle's. *See Tennison v. Circus Circus Enters., Inc.*, 244 F.3d 684, 688 (9th Cir. 2001) (prejudice analysis determines whether error "tainted the verdict"). The exclusion blocked Oracle's only shot at seeking recovery as to smartphones and tablets. Whatever remedy Oracle might be able to obtain in another case challenging Google's infringement with respect to other devices, it cannot undo the prejudice that Oracle suffered here. OB66.

### B. The district court erred in not holding Google accountable for its knowing and repeated false representations in discovery and to the jury.

Google does not deny any of the basic facts about its knowing misrepresentations. On discovery abuse, Google does not dispute that:

- Google flatly and repeatedly represented in discovery that it had no plans to expand Android to PCs;

- these representations were false when made, for the expansion plan was well under way; and

- Google knew they were false.

As to the trial, Google does not deny that:

- Google persistently urged the jury to find fair use because "Android is not a substitute" for Java on desktops and laptops, Appx52127; *see* OB67-69;

- this was false; and

- Google knew it was false—since only minutes after the close of evidence, Google publicly announced that Android was expanding to "desktops and laptops." Appx64.

Misrepresentations this flagrant cry out for some excuse—or, at least, acknowledgment. Google's three-page brush off does neither. It merely rehashes the district court's rationale for denying a new trial, mainly blaming the victim. That is no defense to such a blatant misrepresentation—especially one that Google adopted as a central trial theme.

> ### 1. Google did not cure the false statements in its written discovery by hiding a few documents in a document dump.

Google's brief presents a troubling vision of the role and consequences of discovery abuse in litigation.

Google does not suggest that there was any ambiguity in its statement denying "that GOOGLE intends to use some or all of ANDROID, including DECLARING CODE and SSO from the 37 JAVA API PACKAGES, to create a platform that runs on desktops and laptops." Appx2447-2448. Nor does Google contest that it had a clear

legal obligation to disclose ARC++ in response to this direct interrogatory:  "For any software developed or released by GOOGLE since October 27, 2010, identify all code that contains or replicates code from the 37 JAVA API PACKAGES," Appx1675.  On each occasion— and others, *see, e.g.*, Appx1674-1676—Google does not contest that it knew its statements were false.

Instead of offering an excuse for breaking the discovery rules, Google goes on the offensive, insisting that Oracle is to blame for not noticing a few documents in a last-minute avalanche of paper.  In Google's playbook, a party can lie in discovery so long as it strategically hides the truth somewhere in a mountain of documents.

Google cites no authority for this troubling proposition.  Nor does it reconcile its position with the cases Oracle cited (OB73-74) flatly rejecting it.  The law requires truthful discovery responses because parties rely on them.  Producing a few unidentified documents that contradict explicit written responses cannot possibly cure a misrepresentation that Google knew to be false when made.

Google does not dispute this Court's view that the rule Google proposes would encourage rampant discovery abuse by "prejudic[ing]

the party who acts diligently and complies with the Federal Rules of
Civil Procedure and … benefit[ing] the party who contravenes those
rules and uses dilatory discovery tactics." *Advanced Display Sys., Inc.
v. Kent State Univ.*, 212 F.3d 1272, 1287 (Fed. Cir. 2000).  Nor does it
offer any countervailing benefit to be gained from abandoning this
sound principle.

Google also makes no attempt to rebut our showing (OB72-73)
that, even if document production could in some circumstances correct
or supplement written discovery, it did not do so here.  Google does not
explain how it is possible that not a single document mentioning
ARC++ made it into any document production for nearly six months,
and then somehow showed up in a dump of 350,000 pages just before
the close of discovery as the last fact depositions were being taken.  Nor
does it dispute that the nine draft documents "could not possibly have
been anywhere near all of Google's responsive documents about a
project as significant as ARC++."  OB72-73.  So far as appears from this
record, Google must have intended to withhold *all* evidence of ARC++
and accidentally let these nine documents slip through.

Google also offers no reason why Oracle should have known to go searching through a haystack for a needle it had been assured did not exist.  Google notes that it had previously produced documents about the defunct ARC project, GB77-78, but it does not dispute Oracle's showing that ARC was a "totally different undertaking" and that "it … failed," OB71-72.  Oracle's awareness of the failed ARC project could not have tipped it off to look for documents about a different project that Google swore did not exist.

Google suggests that its discovery misconduct had no effect on the trial because of "the scope of the retrial (the Android operating system in smartphones and tablets)."  GB79.  Google does not present this as a justification for the misstatements, because the court did not restrict the scope of trial until *months* after fact discovery closed.  Appx49-50.  Instead, Google seems to suggest harmless error.  But Google does not deny that had Oracle known the truth, it would have demolished Google's central theme that Android's use of the Java APIs was fair because Android is for smartphones and not PCs or laptops.  OB68-69.  If anything, that Google now tries to use the scope of the trial to justify

its behavior only further confirms just how wrong the district court was to limit the scope of the trial as it did.

### 2. Google does not defend its misrepresentation to the jury.

The opening brief explained that Google consistently made material misrepresentations to the jury. OB20-21, 67-68. Google's one-paragraph defense (GB79) never explains how it could repeatedly tell the jury that "Android is not a substitute," because "Java SE is on personal computers," whereas "Android is on smartphones," Appx52127, knowing that it was moments away from announcing that "the full functionality of Android" would soon be available on computers, Appx64.

Google does not try to distinguish any of the cases compelling a new trial under far less dramatic circumstances. OB69. Take, for example, *Wharf v. Burlington Northern Railroad Co.*, 60 F.3d 631 (9th Cir. 1995). The defendant employer knew throughout the trial (but did not tell the court or plaintiff) that it planned to fire the plaintiff. *Id.* at 634, 637. Yet the defendant argued in its closing, moments after the firing, that "Wharf still has his job" and was therefore entitled to lower damages for his workplace injury. *Id.* The Ninth Circuit vacated the

low damages award and ordered a new trial based on this "false" statement. *Id.* at 638. Google's conduct is no different, and requires the same result. OB67-68.

In a few terse sentences, Google responds only with non sequiturs. Google asserts that it "correctly argued that Android was a full-stack operating system designed for use in smartphones and tablets, whereas [Java SE] was not suitable for use in smartphones and tablets." GB79. But when the charge is that Google built its jury arguments around a misrepresentation, it is no defense to point to another statement that it claims to be true. Try as it might to repackage the argument, Google does not deny that it tried to persuade the jury to find fair use because "Java SE is on personal computers; Android is on smartphones. If you are buying a personal computer … [y]ou don't go out and look for Android or any smartphone." Appx52127. Even the district court recognized that "Google drew a significant distinction between desktops and laptops (Java) and smartphones and tablets (Android)." Appx62. That distinction—critical to the district court's JMOL decision, Appx45—was and is false, and Google offers no justification for it.

Google asserts, without explanation, that ARC++ "is not an operating system" but rather "allow[s] Android apps to run on Chrome OS." GB79-80. That is irrelevant. The precise architecture has no bearing on the falsity of the statement, "If you are buying a personal computer … [y]ou don't go out and look for Android." Appx52127. Operating system or not, what matters is that, in order to allow Android apps to run, ARC++ enables the Android operating system—including Oracle's APIs—to run on PCs in what Google itself describes as the core Java market. *See, e.g.*, Appx63-64.

***

In sum, this was no ordinary discovery abuse and no mundane lawyer misstep. The falsity here was planned, pivotal, and prejudicial. Oracle is entitled to a new trial.

## C.    The district court's evidentiary errors on Google's bad faith require correction.

While evidence of good faith does not support fair use, Google does not dispute that it could have lost fair use outright if it acted in bad faith. OB28. Accordingly, Oracle's evidence of Google's bad faith was highly relevant. Our opening brief explains how the district court undermined Oracle's showing by excluding its strongest evidence on

this issue while allowing Google to introduce evidence that the court itself had ordered excluded as irrelevant and prejudicial. *See* OB74-78. Apart from echoing the district court's rationales, Google barely explains how these rulings were proper and fails to overcome the presumption of prejudice.

*Mazzocchi email*. Google offers no real defense of the district court's redaction of the key statement from Apache's Mazzocchi, in which he admits that Apache was "doing illegal things" by copying the Java declaring code, and that "Android using Harmony code is illegal as well." OB75 (quoting Appx54407). Google repeats the district court's unsupported conclusion that this sentence was "inflammatory," Appx51590, and then purports to distinguish Oracle's authority on the ground that inflammatory evidence is admissible only when "particularly relevant." GB82. But Google has been adamant throughout this litigation that the thoughts of industry participants, like Apache, about the legality of copying Java's code are "particularly relevant" to fair use. *E.g.*, GB3, 45; Appx1616-1617; Appx52095.

Google's other excuses do not hold up either. Google argues that because Mazzocchi did not use the term "fair use" in his email, his views

about the illegality of copying Oracle's APIs are irrelevant.  Not so.  If Google's use was fair, it would not be illegal—and vice-versa.

Nor was the redacted portion of the email cumulative.  Google told the jury in closing that it would not find any document "from anyone … anywhere" saying "Google was wrong or it was somehow a violation to use [the Java API] labels."  Appx52200.  The Mazzocchi email is exactly that document.  Google also makes no attempt to respond to the point (OB75-76) that Google opened the door by eliciting testimony from Mazzocchi that directly contradicted his written words, that he would "have left [Apache] slamming the door" if he thought it was doing "any illegal things."  Appx51729.  Such testimony made this evidence even more probative, particularly on an issue the district court recognized as a "close call," Appx52017.

Google is also wrong that the statement was "hearsay (within hearsay)."  GB81.  The district court had no basis for its speculation that Mazzocchi might have gotten his impression from a lawyer.  Appx72.  And the statement in any event was offered not for its truth as a legal matter but for evidence of Mazzocchi's own belief, as an industry participant.

68

Finally, that Mazzocchi was arguably an undesignated witness does not undermine the prejudice to Oracle. The district court permitted Mazzocchi to testify in exchange for allowing Google itself to call an undisclosed witness. Appx2439-2440.

***European Union document***. Google fails to justify the court's exclusion of Sun's statement to the European Union that it believed that Android was "an unauthorized derivative work of Java SE," Appx54451, a statement that squarely rebutted Google's theme that Sun thought Google's copying was permissible, *see* GB46 ("Sun … welcomed Google's use of the Java APIs."); *accord* GB17-19.

Google asserts that "Oracle's evidence does not fit within [a hearsay] exception," GB83 n.8, but does not rebut Oracle's explanation (OB77) that the document was admissible as a prior consistent statement under Federal Rule of Evidence 801(d)(1)(B).

Google's suggestion (GB83 n.8) that the document was excluded on nondisclosure grounds is demonstrably false: The district court stated expressly that document itself was excluded as "self-serving hearsay." Appx75. The undisclosed documents were drafts that Oracle offered in response to the district court's skepticism that Sun itself, and

69

not Oracle, had authored the statement in question.  Appx75-76.  Those

drafts were offered only to corroborate already admitted witness

testimony from Oracle's CEO that Sun had supplied the statement, and

were unnecessary in light of that unrefuted foundation evidence.  OB76-

77.  Google cannot overcome that evidence by simply repeating (GB83)

the district court's unsupported conjecture about Sun's incentive to

"curry favor" with its new boss—which, if anything, would go to weight

but not make it hearsay.  The district court abused its discretion in

preventing the jury from determining the impact of Sun's statement on

Google's theme that Sun approved of Google's copying.

*GNU.*  The prejudice inflicted by those two errant evidentiary

rulings was particularly severe because the district court allowed

Google excessive leeway in pushing its "everyone thought it was okay to

copy" theme.  OB77-78.  Google proves the point by repeatedly

emphasizing evidence that GNU, a non-commercial research entity,

used the Java APIs with Sun's acquiescence.  GB11, GB46-47.  As

Oracle explained (OB77), that assertion was never supposed to be part

of this case because the court excluded that evidence, but refused to

enforce its pre-trial order.  Google completely fails to respond and

cannot at oral argument. *Henry v. Dep't of Justice*, 157 F.3d 863, 865 (Fed. Cir. 1998).

## III. Google Does Not Urge This Court To Revisit Its Earlier Holding Finding Oracle's Work Copyright Protected.

On copyrightability, Google concedes that its cross-appeal "is limited to preserving its claim that the declarations/SSO are not protected by copyright law." GB83. Google advances no argument for why this Court can or should revisit that holding and has therefore waived the opportunity to do so in this Court. *SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1319 (Fed. Cir. 2006).

## CONCLUSION

This Court should reverse the judgment, or, at a minimum, order a new trial.

August 4, 2017                     Respectfully submitted,

                                  */s/ E. Joshua Rosenkranz*
                                  E. Joshua Rosenkranz
                                  ORRICK, HERRINGTON &
                                      SUTCLIFFE LLP
                                  51 West 52nd Street
                                  New York, NY  10019
                                  (212) 506-5000

*Counsel for Plaintiff-Appellant*

# CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Federal Circuit by using the appellate CM/ECF system on August 4, 2017.

ORRICK, HERRINGTON & SUTCLIFFE LLP

*/s/ E. Joshua Rosenkranz*
E. Joshua Rosenkranz
*Counsel for Plaintiff-Appellant*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i) because this brief contains 13,983 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2013 in Century Schoolbook 14-point font.

Orrick, Herrington & Sutcliffe LLP

*/s/ E. Joshua Rosenkranz*
E. Joshua Rosenkranz
*Counsel for Plaintiff-Appellant*